# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CARLENE MIGHTY, )
Independent Administrator of )
THE ESTATE OF SHIRLEY )
N. EDWARDS, Deceased, )
and CARLENE MIGHTY, )
Individually, )
)
    Plaintiffs, )
) Case No. 16 C 10815
    v. )
) Judge Joan H. Lefkow
SAFEGUARD PROPERTIES )
MANAGEMENT, LLC, )
)
    Defendant. )

## OPINION AND ORDER

Carlene Mighty, individually and in her capacity as independent administrator of the

estate of Shirley N. Edwards (the Estate), deceased, filed suit against Safeguard Properties

Management, LLC, asserting claims for trespass to real property (count I), conversion of

personal property (count II), consumer fraud (count III), and fraud (count IV). (Dkt. 15.)

Safeguard moved to dismiss counts III and IV (dkt. 18), and this court granted that motion as to

the Estate but denied it as to Mighty. (Dkt. 36.) Plaintiffs filed an amended complaint, leaving

intact all four claims but removing the Estate from counts III and IV. (Dkt. 39.) Safeguard now

moves for partial summary judgment on counts II, III, and IV. (Dkt. 47.) Plaintiffs also move for

partial summary judgment on counts I and III.[1] (Dkt. 46.) For the reasons stated below,

---

[1] Because the Estate was dismissed as to count III, Mighty moves for summary judgment in her
individual capacity on count III.

Safeguard's motion for partial summary judgment is granted, and plaintiffs' motion for partial summary judgment is denied.[2]

## BACKGROUND[3]

From March 24, 2005 until her death on March 19, 2013, Shirley Edwards was the legal title holder to property located at 58 Clover Leaf Road, Matteson, Illinois (the Property). (Dkt. 56, Plaintiffs' Response to Defendant's Local Rule 56.1 Statement of Material Facts (Pl. Resp.) ¶¶ 9–10, 12.) Edwards executed a note and mortgage (the Mortgage) with Beneficial Illinois, Inc., d/b/a Beneficial Mortgage Co. of Illinois (Beneficial), a member of HSBC Group, on March 24, 2005, whereby she was indebted to Beneficial in the principal sum of $192,782.39.[4] (*Id.* ¶¶ 9, 17; dkt. 49-7.) Of importance, the Mortgage stated the following:

> **7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest.

> **8. Inspection.** Lender may take or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

---

[2] The court's jurisdiction rests on 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b).

[3] Unless otherwise noted, the facts in this section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

[4] Caliber Home Loans, Inc. acquired the rights to the Edwards's mortgage in or around 2015. (Dkt. 46-5 at 12:21–24.)

(Dkt. 49-3 ¶¶ 7–8.)

On March 24, 2005, Edwards also applied for credit life insurance in the amount of $150,000, which was approved by HSBC on June 10, 2005. (Dkt. 60, Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Material Facts (Def. Resp.) ¶ 2.) The letter from HSBC approving coverage stated: "Congratulations on your recent purchase of Credit Life and Disability Insurance to cover the above-mentioned loan. We are pleased to advise you that the requested coverage has been approved." (Dkt. 46-6 at 8.) Although the letter does not identify the "above-mentioned loan," the Certificate of Group Life Insurance Schedule listed the "Original Amount of Loan" as $192,782.39, the same as the principal on the Mortgage. (*Id.* at 9.)[5]

The last payment made on the Mortgage was on February 28, 2013, and the loan was in default as of March 2013. (Pl. Resp. ¶ 11.) The balance of the Mortgage at the time of Edwards's death (before any potential life insurance was applied to the balance of the Mortgage) was $152,339.38. (*Id.* ¶ 12.)

At the time of Edwards's death, her daughter Mighty lived at the Property. (*Id.* ¶ 10.) She had lived there on and off from 1989 through 2013. (*Id.* ¶ 2.) On two occasions shortly after Edwards's death, Mighty contacted Beneficial to inform it that Edwards had died and to ask about the status of the Mortgage. (*Id.* ¶¶ 14–15.) Beneficial informed Mighty that she would

---

[5] The life insurance policy also stated: "The premiums associated with the insurance coverage(s) listed below will be included as part of your loan as follows: Fixed Monthly Insurance Premium Payment – the premium is not financed but is included with your total monthly payment of interest and principal. If elected, this Insurance is payable in monthly installments, which are due on the same day of each month as the due date of the monthly loan payment. Disclosed below is an Annual Cost (See your Loan Agreement for monthly insurance premium and your total monthly installment.) You wish to elect the following insurance coverage(s) as part of your loan: Single Life (Borrower) - $1260.00." (Dkt. 46-6 at 12.)

have to be named administrator of Edwards's estate to get information about the Mortgage. (*Id.*) Despite taking some early steps to become the administrator of the Estate, Mighty did not file a petition for letters of administration until February 27, 2015, and she was appointed administrator on April 2, 2015. (*Id.* ¶ 16; 49-1 at 97:14–99:6.) Mighty has never made any mortgage payments for the Property, individually or as the administrator of the Estate. (*Id.* ¶ 13.)

On notice of Edwards's death, HSBC retained Safeguard pursuant to a master services agreement (the Agreement) to help manage the Property. (*Id.* ¶ 19; dkt. 46-6 at 39–60.) Safeguard provides property preservation services to the mortgage industry. (*Id.* ¶ 3.) Safeguard does not have employees in every state; it uses a network of providers to carry out the preservation services. (*Id.* ¶¶ 3, 21.) Pursuant to the Agreement, Safeguard remains fully responsible "for any Services performed by a Subcontractor to the Documents," and for "any Services performed by a Subcontractor to the same extent as if [Safeguard] had performed said Services."[6] (Dkt. 46-6 at 55.)

Generally, HSBC issued work order requests to Safeguard, which identified the type of work to be done and the address where the work was to be performed. (*Id.* ¶ 20.) Safeguard, in turn, issued work orders to one of its vendors who then performed the specified work. (*Id.*) Safeguard is not permitted to request that its vendors do any work other than what is in the work order request from HSBC. (*Id.* ¶ 24.) Safeguard's vendors do not receive a salary or benefits, such as medical or life insurance, from Safeguard. (*Id.* ¶ 22.) They supply their own tools and equipment for the jobs and are compensated when they complete a work order. (*Id.*) Although

---

[6] Subcontractor is defined as "a person or entity who has a direct contract with [Safeguard] to perform a portion of the Services." (Dkt. 46-6 at 55.) Contract Documents is defined as "this Agreement and any Exhibits mutually agreed upon in writing by the parties, and any subsequent agreement(s) modifying the Services, mutually agreed upon in writing by the parties," as well as "all items necessary for the proper execution and completion of Services by [Safeguard.]" (Dkt. 46-6 at 39.)

the vendors cannot alter the work order instructions provided to them, they can refuse to complete a work order. (*Id.*; Def. Resp. ¶ 19.)

On July 3, 2013, HSBC issued a work order request to Safeguard to inspect the Property for occupancy. (Pl. Resp. ¶ 23.) Safeguard then engaged one of its vendors, who on July 16, 2013, August 9, 2013, and September 12, 2013, reported the Property was vacant based on visual inspections. (*Id.* ¶¶ 25, 27.) The vendor performed the visual inspections from afar, without setting foot on the Property. (*See* dkt. 46-3 at 81:21–82:4; 88:10–16.) On September 17, 2013, Beneficial sent a letter to Edwards at the Property (the Letter), which stated:

> Beneficial was recently notified that the property referenced above may be vacant. A vacant property can be an invitation for vandalism and other damage due to neglect. Additionally, a vacant property may adversely impact the value of your property and other properties in the neighborhood.
>
> Please contact us immediately with information regarding the occupancy status of this property at the phone number provided below.
>
> If we do not hear from you within ten (10) calendar days from the date of this letter, we may be forced to take whatever action is necessary to protect our interest in this property according to the terms of your mortgage documents. This may include, but is not limited to, securing and winterizing the property. You may be held responsible for the cost of any action we are forced to take to protect this property.
>
> Please be advised in some cases we may be forced to take immediate action to protect our interests, if applicable.

(Dkt. 49-12.) On September 17, 2013, Beneficial also issued a Grace Period Notice and a Notice of Right to Cure Default to Edwards at the Property. (Dkt. 46-6 at 31, 33.) The Grace Period Notice provided, in relevant part:

> YOUR LOAN IS MORE THAN 30 DAYS PAST DUE . . . YOU HAVE A GRACE PERIOD OF 30 DAYS FROM THE DATE OF THIS NOTICE TO OBTAIN APPROVED HOUSING COUNSELING. DURING THE GRACE PERIOD, THE LAW PROHIBITS US FROM TAKING ANY LEGAL ACTION AGAINST YOU.

(Dkt. 46-6 at 31.) And the Notice of Right to Cure Default stated, in relevant part:

> This is a notice of breach under the terms of the Note and Mortgage/Deed of Trust for this account because we have not received the payments that were due on or after 3/30/2013.
>
> To correct this breach, the total amount of $9,069.86 in the form of certified funds, must be received in our office no later than 10/17/2013. Only the full amount will be accepted. . . .
>
> It is our intent to declare the loan past due and payable immediately if the above referenced breach is not remedied as outlined by this letter. Failure to cure the default on or before the date specified in this notice will result in acceleration of the sums secured by the Mortgage/Deed of Trust and may result in sale of the property through foreclosure.

(Dkt. 46-6 at 30.)

At some point between September 12 and September 30, 2013, HSBC sent Safeguard a request to perform an "initial secure" of the Property, which included changing the locks, winterizing the house, and cutting the grass. (Pl. Resp. ¶ 29.) On September 30, 2013, Safeguard issued a work order to its vendor S.M.A.R.T. Property Preservation, Inc. (Smart) to perform the initial secure HSBC requested, provided Smart determined the Property was vacant. (*Id.* ¶ 30.) Safeguard engaged Smart pursuant to a written agreement to "perform mortgage field services, to be set forth in a series of work orders, each of which will describe a specific property to be serviced and the type of services to be completed by a specified date." (Dkt. 46-7 at 8.) On October 3, 2013, Smart visited the Property and reported it to be vacant. (Pl. Resp. ¶ 31.) Smart then changed the locks, secured the front door with a lockbox, and performed winterization services identified on the work order update. (*Id.*) A notice was also placed on the front door of the Property on October 3, 2013, which read:

# IMPORTANT!

We found this property to be vacant. This information will be reported to the mortgage holder. The mortgage holder has the right to protect this property. The property will be rekeyed and/or winterized within 3 days. If this property is NOT VACANT, please contact Safeguard Properties at 877-340-8482.

(Dkt. 49-16.)

On October 14, 2013, Smart informed Safeguard that the requested services had been completed and invoiced Safeguard for the work it had performed at the Property. (Pl. Resp. ¶ 32; Def. Resp. ¶ 22.) It also submitted a bid to remove personal items it found at the Property, including, "[c]lothing, sofa, mattresses, furniture, lamps, wall paintings, rugs, TV's, ironing board, linen, glass table, kitchen items, dishes, stools, chairs, dressers, full plastic bins, shelving, space heaters, full alcohol bottles, canned goods, paper and plastic items, misc debris, trash . . . exercise machine, tredmill [sic]." (Dkt. 49-14 at 3.) On October 18, 2013, Safeguard's vendor again visited the Property and reported it vacant after a visual inspection. (Pl. Resp. ¶ 33.) It also reported that there were personal items and debris present and noted that a bid to remove the items had previously been submitted. (*Id.*; dkt. 49-15.) Neither HSBC nor Safeguard approved the bid, and Safeguard did not receive an invoice from its vendors for removal of personal property. (Pl. Resp. ¶¶ 32, 34.)

On or about October 21, 2013, Mighty returned to the Property. (*Id.* ¶ 35; Def. Resp. ¶ 24.) She had been in Kentucky since September 2013. (Pl. Resp. ¶ 35.) While she was gone, no one was staying at the Property, no lights were left on, and no one was maintaining the Property, cutting the grass, or retrieving the mail. (*Id.*) Upon her return, Mighty discovered that the locks had been changed and found the notice on the door directing her to call Safeguard if the Property was not vacant. (*Id.* ¶ 36.) Mighty used a

7

ladder to gain access through an unlocked sliding glass door on the second story, at the back of the Property. (*Id.* ¶ 38; dkt. 49-1 at 111:1–19.) She called the police, who went to the Property but advised Mighty that this was a civil matter and that she should call Safeguard instead. (Pl. Resp. ¶ 39.) After retrieving a few items of clothing, Mighty locked all the doors (including the sliding door upstairs) and left. (*Id.* ¶ 39.)

The next day, Mighty called Safeguard and reported she had been locked out of her home. (*Id.* ¶ 40.) During that call, Safeguard stated that the Property had been determined to be vacant, that Mighty would have to contact the lender, that Safeguard would try to get Mighty access to the Property, and that it would open a claim and start an investigation. (*Id.*) Safeguard then notified HSBC of Mighty's call, and HSBC instructed Safeguard to remove the lockbox and give Mighty access to the Property. (*Id.* ¶ 41.) Safeguard issued a work order to one of its vendors, The McGraw Companies, Inc. (McGraw), that same day, which instructed the vendor to "meet with the homeowner tomorrow morning at 9 [a.m.] to remove the lockbox and hand the keys over to her." (*Id.* ¶ 42; dkt. 46-7 at 57.) Shortly thereafter, HSBC instructed Safeguard to cancel the work order, and Safeguard then instructed McGraw to do the same. (Pl. Resp. ¶¶ 42–43.) Safeguard also called Mighty to inform her that the mortgage company would not authorize it to let Mighty enter the Property because she was not the administrator of the Estate and directed Mighty to contact the mortgage company directly. (*Id.* ¶ 44.) After that conversation, Safeguard and Mighty had no further contact other than one piece of mail, which Safeguard sent to Mighty so she could submit her claim for missing property. (*Id.* ¶¶ 46–47.) Mighty does not know who allegedly removed her personal property, when it was removed, or how many third parties entered the Property after Edwards's

death. (*Id.* ¶¶ 48, 53.) One of Edwards's neighbors also saw Mighty's sister remove furniture and other large items of personal property on at least two separate occasions in the Spring of 2013. (*Id.* ¶ 51; dkt. 49-17 at 14:13–23.)

Mighty did not gain access to the Property again until August 2015, after she was made administrator of the Estate. (Def. Resp. ¶ 27.) A foreclosure action was filed against Edwards and Mighty in the Circuit Court of Cook County on February 26, 2016 (2016 CH 02773) and is still pending. (Dkt. 46-6 at 33.)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir.

2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

### I.       Trespass to Real Property (Count I)

Plaintiffs move for summary judgment on count I, trespass to real property. Under Illinois law, trespass is "an invasion in the exclusive possession and physical condition of land." *Lyons* v. *State Farm Fire & Cas. Co.*, 811 N.E.2d 718, 725, 349 Ill. App. 3d 404 (Ill. App. Ct. 2004). It is the entry onto another's land "without permission, invitation or other right." *Hendle* v. *Stevens*, 586 N.E.2d 826, 832, 224 Ill. App. 3d 1046 (Ill. App. Ct. 1992). "One can be liable in trespass for an intrusion by a third party if he acts with knowledge that his conduct will, with a substantial degree of certainty, result in the intrusion." *Sak* v. *CitiMortgage, Inc.*, 940 F. Supp. 2d 802, 804 (N.D. Ill. 2013) (citing *Dietz* v. *Ill. Bell Tel. Co.*, 507 N.E.2d 24, 26, 154 Ill. App. 3d 554 (Ill. App. Ct. 1987)). Thus, one who "aids, abets, assists, or directs the commission of a trespass by another is liable for trespass." *Id.* (citing *Miller* v. *Simon*, 241 N.E.2d 697, 700, 100 Ill. App. 2d. 6 (Ill. App. Ct. 1968)).

Plaintiffs argue that when Safeguard's vendor—at Safeguard's order and direction— entered the Property and changed the locks, it committed the act of trespass, for which Safeguard is liable. They maintain that Safeguard is liable for the actions of its vendors because (a) Safeguard ordered the vendors to secure the Property; (b) Safeguard maintained control over its vendors such that it is responsible for the actions of its vendors pursuant to principles of agency law; and (c) the Agreement Safeguard entered into with HSBC stated that Safeguard is fully responsible "for any Services performed by a Subcontractor to the Documents," and for "any Services performed by a Subcontractor to the same extent as if [Safeguard] had performed said Services." (Dkt. 46-6 at 55.) Further, plaintiffs argue that foreclosure law regarding the "right to

possession," 735 ILCS 5/15-1701, establishes that a mortgagee is not entitled to possession of a mortgagor's home without a court order and that, in this case, no foreclosure action had been filed at the time of the alleged trespass. Plaintiffs also point to the fact that despite the 30-day Grace Period Notice issued on September 17, 2013, which prohibited "taking any legal action" during that period, Safeguard secured the Property on October 3, 2013. Finally, plaintiffs maintain that Safeguard continued to trespass by refusing to give Mighty access to the Property even after she called Safeguard and demanded that she be placed back in possession of the Property.

Safeguard does not address whether it is liable for the actions of its vendors. Instead, it counters that a trespass did not occur because the entry onto the Property was done pursuant to a contractual right—namely, the "Protection of Lender's Security" and "Inspection" provisions in the Mortgage allowing Beneficial to enter the Property to protect its security interest if Edwards breached the Mortgage. Safeguard argues that the September 17, 2013 letter Beneficial sent to Edwards cuts in its favor because it put Edwards on notice that Beneficial would take steps to protect its interest in the Property pursuant to the terms of the Mortgage—including, but not limited to, securing and winterizing the Property—unless Beneficial received a response within ten days. The vendors entered onto the Property to secure and winterize the Property under the terms of the Mortgage and thus did not commit trespass. Safeguard also maintains that a foreclosure action is irrelevant because taking possession is not an element of a trespass action.

Plaintiffs' reliance on foreclosure law is unpersuasive. There is "a substantial difference between the right to possession for residential purposes, which the[] [foreclosure] statutes address, and the contractual right to enter" to protect a lender's interest in the property. *Schweihs*

11

v. *Chase Home Fin., LLC*, 77 N.E.3d 50, 64, 2016 IL 120041 (Ill. 2016).[7] Safeguard's vendors inspected the Property on three separate occasions—July 16, 2013, August 9, 2013, and September 12, 2013—and reported it vacant. The September 17, 2013 Letter, Grace Period Notice and Notice of Right to Cure Default then theoretically (had she not passed away) put Edwards on notice of her default and the fact that if Beneficial did not hear back in 10 days it "may be forced to . . . protect [its] interest in [the] property . . . includ[ing] but not limited to, securing and winterizing the property." (Dkt. 49-12.) Thus, when Safeguard's vendor secured the Property on October 3, 2013 (after again confirming that the Property was vacant), it had taken multiple steps to ensure the Property was vacant and put Edwards on notice that it may need to protect its interest in the Property. There is no indication that Safeguard took "legal action" (i.e., filed a foreclosure action)[8] during the 30-day grace period or took possession for residential purposes as plaintiffs contend. Rather, Safeguard acted consistently with the terms of the Mortgage, which allowed Beneficial to "take such action as is necessary to protect Lender's

---

[7] Plaintiffs argue that "*Hendle* v. *Stevens*" is distinguishable because in that case, a judgment of foreclosure was entered before Safeguard attempted to secure the property at issue, and the facts in that case suggest that entry onto the resident's property was done only for preservation purposes. Given plaintiffs' description of the case, the court assumes plaintiffs refer to *Schweihs*. Assuming that is the case, the court is not persuaded by plaintiffs arguments. Although a judgment of foreclosure had been entered at the time Safeguard entered the property in *Schweihs*, the plaintiff had the right to possession of her home until the redemption period expired, which was after Safeguard attempted to secure the property. Further, like this case, Safeguard in *Schweihs* was engaged to perform an "initial secure," which generally requires a vendor to secure access to the property by changing one of the locks on the premises and to winterize the house by turning off the utilities. Plaintiffs are correct that the *Schweihs* vendor removed a secondary lock rather than changing a lock, but removing the secondary lock was intended to give the mortgagee access for preservation services. Plaintiffs are also correct that the *Schweihs* vendor did not prevent the resident's entry to the property, but this is because the resident appeared in the house when Safeguard's vendor was there. The vendor had conducted a visual inspection of the property, determined that it was unoccupied, and had every intention of proceeding with the "initial secure" order, which would presumably have prevented the resident from gaining access to the property had the resident not showed up.

[8] The Grace Period Notice was required pursuant to the Homeowner Protection Act, 735 ILCS 15-1502.5, which is no longer in effect. The notice was required before a lender could file a foreclosure action against a mortgagor.

interest" (dkt.49-3 ¶¶ 7–8) if Edwards fell into default. *See Marshall* v. *JP Morgan Chase Bank*, No. 3:11 CV 332, 2015 WL 1455083, at *10 (N.D. Ind. Mar. 30, 2015) (finding that subcontractor of mortgage company hired to carry out an inspection did not trespass because he "entered the property pursuant to a right to do so set out in the mortgage agreement," where the mortgage allowed the lender to "do and pay for whatever is necessary to protect the value of the property and the [l]ender's rights in the property").

Plaintiffs' contention that Safeguard continued to trespass when it refused to give Mighty access to the Property after she returned from Kentucky is similarly unpersuasive. Mighty was not listed on the Mortgage and was not the administrator of Edwards's estate at that time. For all HSBC and Safeguard knew, Mighty was legally a stranger seeking entrance to the Property. Safeguard was under no obligation to provide Mighty access to the Property and, in fact, told her that because she was not the administrator of the Estate, she would need to contact the mortgage company directly. Based on this record, the court cannot conclude that a trespass occurred. Plaintiffs' motion for summary judgment as to count I is thus denied.

## II. Conversion of Personal Property (Count II)

Safeguard moves for summary judgment on count II, conversion of personal property.

### A. Conversion

Conversion is "the unauthorized deprivation of property from the person entitled to its possession." *Kane Cty. Pub. Guardian* v. *Richard Yanni*, 48 N.E.3d 1161, 1166, 2015 IL App (2d) 150108 (Ill. App. Ct. 2015). Its essence is "the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Id.* A cause of action for conversion requires "(1) the unauthorized and wrongful assumption of control, dominion, or ownership by the defendant over the personal property of another; (2) the plaintiff's right in the property; (3)

the plaintiff's absolute and unconditional right to immediate possession of the property; and (4) a demand for possession of the property." *Id.*

Safeguard argues that it did not remove or cause to be removed any of Mighty's or Edwards's personal property and never exercised control, dominion or ownership over the personal property. It points out that although Safeguard's vendor submitted a bid to remove personal items from the Property, that bid was never approved and at no point did Safeguard authorize its vendor to remove personal items from the Property. Safeguard also notes that Mighty does not know who removed the personal property, when it was removed, what third parties accessed the Property, or how many times the Property was accessed by third parties. Plaintiffs counter that, although they do not know who removed the personal property at issue, it was at the Property on October 3, 2013—as noted on the reports the vendor sent to Safeguard after securing the Property on that date—but was missing when she returned on or around October 21, 2013. A reasonable inference, therefore, is that Safeguard's vendor removed the personal property from the Property.

Viewing the facts in the light most favorable to plaintiffs, there is a genuine issue of material fact as to who allegedly removed the personal property. Although third parties could have removed it (e.g., Mighty's sister, who Edwards's neighbor had previously seen enter the Property and remove furniture and other large items of personal property in the Spring of 2013), just as plausibly, Safeguard's vendor could have removed the personal property at the time it gained access to and secured the Property. Because "[i]t is not for the court to choose among inferences and determine which inference is most likely," *U.S. Sec. & Exch. Comm'n* v. *Yang*, 999 F. Supp. 2d 1007, 1016 (N.D. Ill. 2013), the court will not do so here.

14

### B.    Liability

Safeguard also argues that even if its vendor did possess the personal property, it is not liable for the actions of its vendor because the vendor was an independent contractor and Safeguard did not retain control over the manner in which the vendor performed its work, nor did Safeguard approve or direct its vendor to take possession of the personal property. Mighty counters that the Agreement Safeguard entered into with HSBC holds it fully responsible for any services performed by a subcontractor.

To determine whether Safeguard's vendor was an independent contractor or an employee, general principles of agency law apply and a number of factors are to be considered in making the determination: (a) the right of control; (b) the skill involved in the work contemplated; (c) the method of payment; (d) the work schedule; (e) the right to discharge; (f) who provides the tools materials, or equipment; (g) whether the worker's occupation is related to that of the employer; and (h) who deducts or pays for insurance, social security, and taxes on the employee's behalf. *Wheaton* v. *Suwana*, 823 N.E.2d 993, 997, 355 Ill. App. 3d 506 (Ill. App. Ct. 2005). While no single factor is dispositive, the most important factor is "the right to control the manner in which the work is done." *Warren* v. *Williams*, 730 N.E.2d 512, 518, 313 Ill. App. 3d 450 (Ill. App. Ct. 2000).

With respect to the control factor, Safeguard issued a work order to Smart, which directed it to lock, winterize, and cut the grass at the Property, with clarifying instructions below each task Smart was to perform. The work was to be completed sometime between September 30, 2013 and October 3, 2013. Smart maintained flexibility around when the work would be performed and how it would be carried out, which suggests a lack of control. Further, Safeguard's vendors do not receive a salary or benefits, such as medical or life insurance, from

15

Safeguard. They supply their own tools and equipment for their jobs, and they are compensated when they complete a work order. Although the vendors cannot alter the work order instructions provided to them, they can refuse to complete a work order. It is evident that Smart controlled the manner and method of the work at issue and was thus an independent contractor for purposes of securing and winterizing the Property. Given this finding, and because "[a]n employer is generally not liable for the acts of independent contractors," *Kouba* v. *E. Joliet Bank*, 481 N.E.2d 325, 328, 135 Ill. App. 3d 264 (Ill. App. Ct. 1985), Safeguard cannot be held liable here.[9]

The Agreement between Safeguard and HSBC does not change the analysis. Quite simply, the alleged removal of personal property from the Property was not a "Service"[10] laid out in a work order. Thus, although the Agreement states that Safeguard is responsible for any "Services" performed by its vendors, Safeguard never directed Smart to remove personal property from the Property; it never issued a work order to this effect; and it never approved Smart's bid to remove personal property. Even if Smart did take personal property from the Property, Safeguard cannot be held liable because such action is outside the scope of Smart's authority as defined in the Agreement and work orders thereto. Safeguard's motion for summary judgment as to count II is thus granted.

---

[9] Although as a general rule, no vicarious liability exists for the actions of independent contractors, vicarious liability "may nevertheless be imposed for the actions of independent contractors where any agency relationship is established." *Petrovich* v. *Share Health Plan of Illinois, Inc.*, 719 N.E.2d 756, 765, 188 Ill. 2d 17 (Ill. 1999). "A principal-agent relationship exists when the principal has the right to control the manner in which the agent performs his work and the agent has the ability to subject the principal to personal liability." *Santana* v. *State Bd. of Elections*, 864 N.E.2d 944, 952, 371 Ill. App. 3d 1044 (Ill. App. Ct. 2007). Although neither party adequately addresses this aspect of liability, as discussed above, it does not appear that Safeguard maintained the right to control the manner in which Smart performed its work, and thus a principal-agent relationship does not follow.

[10] The Agreement defines "Services," as "the work described in Exhibit A, Description of Services attached hereto or any subsequent Exhibits or Contract Documents." (Dkt. 46-6 at 39.) It does not appear that Exhibit A has been provided to the court. There is, however, no evidence that Safeguard ever directed a vendor to remove personal property from the Property, so the court will not infer that this was a "Service."

### III.     Consumer Fraud (Count III)

Both Mighty and Safeguard move for summary judgment on count III, consumer fraud. The elements of a claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.*, are these: "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." *CHS Acquisition Corp.* v. *Watson Coatings, Inc.*, No. 17-CV-4993, 2018 WL 3970137, at *12 (N.D. Ill. Aug. 20, 2018) (quoting *Cocroft* v. *HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015)). The protections of the ICFA are generally limited to "consumers." *Id.* A consumer is defined in the ICFA as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e).

This court previously determined that the Estate is not a proper plaintiff as it pertains to count III and that Mighty, in her individual capacity, is not within the traditional understanding of ICFA consumers, so her claim must be analyzed under the "consumer nexus test." (Dkt. 36 at 6.) This test requires the plaintiff to "have suffered damages resulting from conduct that is either directed toward the market or otherwise implicated consumer protection concerns." *MacNeil Auto. Prods., Ltd.* v. *Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 792 (N.D. Ill. 2010) (citing *Athey Prods. Corp.* v. *Harris Bank Roselle*, 89 F.3d 430, 436–37 (7th Cir. 1996)). Specifically, the plaintiff must show (1) that its actions were akin to a consumer's actions to establish a link between it and consumers; (2) how defendant's representations concerned consumers other than plaintiff; (3) how defendant's particular action involved consumer protection concerns; and (4) how the requested relief would serve the interest of the consumers. *Thrasher-Lyon* v. *Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 912 (N.D. Ill. 2012) (internal citations omitted).

17

Despite this court's previous ruling, Mighty does not address the "consumer nexus test" in her motion for summary judgment. Safeguard challenges the second element of the test, arguing there is no evidence demonstrating that Safeguard's alleged deceptive or unfair practices affected consumers other than Mighty. As Safeguard argued insupport of its motion to dismiss, it asserts that Mighty cannot prove the second element of the "consumer nexus test" by attaching to her complaint in this case a complaint filed by the Illinois Attorney General (the AG Complaint), 13-CH-20715, containing various allegations of misconduct by Safeguard, because the AG Complaint contains only allegations rather than proven facts. As this court noted at the motion to dismiss stage, "Mighty will eventually have to prove that other consumers were affected by Safeguard's conduct." (Dkt. 36 at 7–8.)

In her reply, Mighty argues that because Safeguard agreed to pay approximately $950,000 to the Illinois AG (to be distributed to "eligible consumers") to settle the case (dkt. 46-7 at 75–76), this somehow proves the allegations in that complaint. But Safeguard entered into a Consent Decree to settle the case with neither "an admission of facts nor an admission of liability." (Dkt. 46-7 at 64.) The Consent Decree thus cannot be taken as an admission of wrongdoing by Safeguard and fails to help Mighty prove the allegations in the AG Complaint.[11]

Mighty also directs the court to an affidavit provided by Patrick Hurley, the Mediation Coordinator of the Mediation Unit of the Consumer Fraud Bureau at the Office of the Illinois Attorney General, and approximately 364 pages of "complaints that individuals [] submitted to

---

[11] Mighty also argues that because the Important! sticker Safeguard's vendor placed on the Property on October 3, 2013 had been around for a "very, very long time," and was placed on properties when changing locks to preserve assets, this shows that Safeguard "engaged in break ins and lock changing conduct" for years and with other consumers in Illinois. (Dkt. 55 at 7.) That this sticker may have been used on multiple homes does not demonstrate that Safeguard "engaged in break ins" or that any other consumers were affected by Safeguard's alleged unfair or deceptive practices.

the Mediation Unit of the Illinois Attorney General's Office relating to Safeguard Properties."
(Dkts. 58-5; 58-6; 58-7; 58-8; 58-9.) Mighty argues that these complaints prove there were
"other consumers" affected by Safeguard's actions. But these documents were never produced
during discovery (despite Safeguard's requesting any and all documents received pursuant to any
subpoenas or Freedom of Information Act requests issued by plaintiffs), and Mr. Hurley was not
identified as a potential witness in plaintiffs' Rule 26(a)(1) Initial Disclosures or their Rule 26(e)
supplement.[12] Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide
information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use
that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the
failure was substantially justified or is harmless." In her briefing on the motions for summary
judgment, Mighty made no showing that the failure to disclose Mr. Hurley or the documents
attached to his affidavit was substantially justified or harmless and, in fact, never even
acknowledged that the documents had not been produced in discovery.

After attempting to rely on documents not produced in discovery without apprising the
court of this information, Mighty apparently realized her mistake and essentially attempted to
supplement her summary judgment briefing by bringing a curious Motion for Order Ruling
Plaintiff is Not Required to Submit Proof of "Other Customers"[13] in Their Consumer Fraud
Claim (the Other Consumers Motion). (Dkt. 66.) Although the court need not consider this

---

[12] Mighty notes that the identities of the people who would testify about the facts underlying the
364 pages of "complaints," were disclosed during discovery, but that Safeguard chose not to depose them.
Without the production of the relevant documents, however, Safeguard cannot be expected to blindly
depose individuals who have no proven connection to the case. Further, given that the names of the
individuals in the documents attached to Mr. Hurley's affidavit are redacted, it is not even clear that the
individuals disclosed by plaintiffs during discovery match those in the 364 pages of "complaints."

[13] Plaintiffs later recognize that their motion should have said "Other Consumers." (*See* dkt. 71 at
n.1.)

motion as it falls outside the summary judgment briefing, it does so here for the sake of completeness.[14]

In their motion, plaintiffs argue that Safeguard had the documents attached to Mr. Hurley's affidavit but refused to produce them because it deemed the documents irrelevant.[15] Safeguard served its answers and objections to Mighty's requests for production on April 27, 2017, well before this court's ruling on September 7, 2017, which established that Mighty did not fall under the traditional definition of a "consumer" and would therefore have to meet the "consumer nexus test" and "prove that other consumers were affected by Safeguard's conduct." (Dkt. 36 at 8.) After this ruling, plaintiffs did not confer with Safeguard to resolve the objection nor did they seek a ruling on the validity of the objection in light of the court's ruling. Instead, well after the September 30, 2017 close of discovery, and after summary judgment briefing concluded, plaintiffs now ask the court to take extraordinary measures and find either that Mighty is not required to prove that "other consumers" were affected by Safeguard's actions—an essential element of her ICFA claim—or that she may rely on undisclosed documents attached to Mr. Hurley's affidavit as part of the cross motions for summary judgment. The court will do neither.

---

[14] Even if the court treats the Other Consumers Motion as a sur-reply, plaintiffs should have asked for the court's permission to file such a reply and "[t]he decision to permit the filing of a surreply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Meraz-Camacho* v. *United States*, 417 F. App'x 558, 559 (7th Cir. 2011). The court could thus choose not to consider the Other Consumers Motion in its entirety.

[15] Plaintiffs' ninth request for production asks for "[a]ll documents that consist of, refer to or relate to claims by other persons, entities or governmental agencies that Safeguard engaged in any deceptive act, fraud, acts removing personal property from real estate or changing locks on homes in addition to the claims made by plaintiffs." (Dkt. 66-1 at 11.) Safeguard's response states, "Safeguard objects to this request on the basis that it is not relevant nor is it likely to lead to the discovery of relevant information, it is overbroad and unduly burdensome and its scope is not proportional to the needs of the case, as such, these documents are being withheld." (*Id.*)

When evaluating whether a failure to disclose was substantially justified or harmless, the court looks to "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble* v. *Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012). The prejudice to Safeguard is clear—it cannot now depose Mr. Hurley or any of the individuals (the names of which are redacted) about the allegations in the consumer complaints, nor can it incorporate such relevant information into its summary judgment briefing. There is no plausible way to cure the prejudice apart from reopening discovery and ordering new summary judgment briefing, which would come at great expense to the parties. Further, the only justification plaintiffs offer for their failure to produce the relevant documents earlier is that they apparently did not have the documents in their possession until March 29, 2018, the day they filed their response to Safeguard's motion for summary judgment. At that point, plaintiffs knew discovery had been closed for approximately six months, but instead of supplementing its Rule 26 disclosures as required, or alerting the court to the fact that they had just received these documents, plaintiffs simply relied on the documents in their response to Safeguard's motion and in their reply to their own motion as if they had been properly disclosed during discovery. Safeguard was forced to bring this to the court's attention in its reply and plaintiffs now attempt to string together a threadbare justification for their actions.

Mighty's Hail Mary to save her ICFA claim falls short. The court bars the 364 pages attached to Mr. Hurley's affidavit and will not rely on these documents for purposes of its ruling on the summary judgment motions before it.[16] *See* Fed. R. Civ. P. 37(c)(1). Thus, Mighty has not

---

[16] Even if the court did rely on the documents attached to the Hurley affidavit, they are inadmissible hearsay, which precludes the court from considering the documents for purposes of summary judgment. *See Gunville* v. *Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider

done enough to prove that Safeguard's alleged deceptive or unfair practices affected consumers other than herself. Mighty's motion for summary judgment as to count III is denied and Safeguard's motion as to count III is granted. Plaintiffs' Other Consumers Motion is also denied.

## IV. Common Law Fraud (Count IV)

Safeguard moves for summary judgment on count IV, common law fraud. To state a claim for common law fraud, the plaintiff must prove "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Laborers' Pension Fund* v. *Lake City Janitorial, Inc.*, 758 F. Supp. 2d 607, 616 (N.D. Ill. 2010) (quoting *Doe* v. *Dilling*, 888 N.E.2d 24, 35–36, 228 Ill. 2d 324 (Ill. 2008)).

In the Third Amended Complaint, Mighty alleges that Safeguard represented to her on multiple occasions, through notices in the mail and on the Property and by numerous phone calls, that the Property was vacant; that Safeguard had the right to change the locks on the Property; that Safeguard had the right to deny her access to the Property; that Safeguard had the right to enter the Property; and that it had the right to remove Mighty's personal property from the Property. (Dkt. 39 ¶ 62.) As explained in conjunction with count I, when Safeguard's vendor secured the Property on October 3, 2013, Safeguard had taken multiple steps to ensure the Property was vacant, and acted consistently with the order from HSBC and the terms of the Mortgage, which allowed Beneficial to "take such action as is necessary to protect Lender's interest," if Edwards fell into default. There is no evidence that the documents putting Mighty on notice of potential securing and winterization of the Property contained false statements. Nor is

---

only admissible evidence in assessing a motion for summary judgment."); *Logan* v. *Caterpillar, Inc.*, 246 F.3d 912, 915 (7th Cir. 2001) (inadmissible hearsay is not enough to preclude summary judgment).

there evidence that Safeguard made false statements tied to Mighty's right to access the Property. She was not the administrator of the Estate and thus was directed to discuss her options with the mortgagee. Further, there is no evidence that Safeguard represented to Mighty that it had the right to remove her personal property from the Property. Safeguard's motion for summary judgment as to court IV is granted.

## V.     Safeguard's Third Affirmative Defense

Plaintiffs also move the court to dismiss Safeguard's Third Affirmative Defense. That defense states, "In the event the subject loan to the Mortgagor was insured by the United States Federal Housing Administration ("FHA") it was subject to the regulations of the Department of Housing and Urban Development ("HUD")." Thus, "any actions taken by Safeguard or its independent contractors to inspect, preserve and secure the property at the direction of the Mortgagee were permissible and required under the applicable HUD regulations." (Dkt. 41 at 15.) Plaintiffs argue that there is no evidence that the loan at issue was insured by the FHA. Safeguard does not challenge this assertion. The court therefore strikes Safeguard's third affirmative defense.

## CONCLUSION AND ORDER

For the foregoing reasons, plaintiffs' motion for partial summary judgment is denied. Safeguard's motion for partial summary judgment is granted. Specifically, plaintiffs' motion as to count I is denied, Safeguard's motion as to count II is granted; Mighty's motion as to count III is denied and Safeguard's motion as to count III is granted; and Safeguard's motion as to count IV is granted. Safeguard's third affirmative defense is stricken. Plaintiffs' Motion for Order Ruling Plaintiff is Not Required to Submit Proof Of "Other [Consumers]" in Their Consumer Fraud Claim (dkt. 66) is also denied. The case will be called for a status hearing on November 14

at 9:30 a.m. Before the status hearing, the parties are directed to discuss the possibility of settlement.

Date:  October 30, 2018
_____
U.S. District Judge Joan H. Lefkow